Robert E. CREIGHTON, Jr. and Sarisse Creighton, Husband and Wife, Individually, and on Behalf of Their Minor Children, Shaunda Creighton and Tiffany Creighton, Appellants,

v.

The CITY OF ST. PAUL, a Municipal Corporation; Officer John DeNoma; Officer Daniels, Officer Ashton, Officer Gelao, Officer Snyder, and Officer Stefan, Whose True First Names are Unknown to Plaintiffs,

Russell Anderson, Appellee,

John Doe, Richard Roe, and Michael Moe, Whose True Names are Unknown to Us.

No. 84–5150.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1985.

Decided July 12, 1985.

John P. Sheehy, Minneapolis, Minn., for appellants.

Jon M. Hopeman, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, and HEANEY and FAGG, Circuit Judges.

HEANEY, Circuit Judge.

The issue in this appeal is whether the district court erred in granting Federal Bureau of Investigation Agent Russell Anderson's motion for summary judgment on the Creightons' claim that Anderson's warrantless search of their home at night violated their rights under the fourth amendment to the United States Constitution. For the reasons set forth below, we reverse and remand.

## I. FACTS.

Because this case was dismissed on Anderson's motion for summary judgment, we set out the facts in the light most favorable to the Creightons and draw all inferences from the underlying facts in their favor.[1] *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). On the night of November 11, 1983, Sarisse and Robert Creighton and their three young daughters were spending a quiet evening at their home when a spotlight suddenly flashed through their front window. Mr. Creighton opened the door and was confronted by several uniformed and plain clothes officers, many of them brandishing shotguns. All of the officers were white; the Creightons are black. Mr. Creighton claims that none of the officers responded when he asked what they wanted. Instead, by his account (as verified by a St. Paul police report), one of the officers told him to "keep his hands in sight" while the other officers rushed through the door. When Mr. Creighton asked if they had a search warrant, one of the officers told him, "We don't have a search warrant [and] don't need [one]; you watch too much TV."

Mr. Creighton asked the officers to put their guns away because his children were frightened, but the officers refused. Mrs. Creighton awoke to the shrieking of her children, and was confronted by an officer who pointed a shotgun at her. She allegedly observed the officers yelling at her three daughters to "sit their damn asses down and stop screaming." She asked the officer, "What the hell is going on?" The officer allegedly did not explain the situation and simply said to her, "Why don't you make your damn kids sit on the couch and make them shut up."

One of the officers asked Mr. Creighton if he had a red and silver car. As Mr. Creighton led the officers downstairs to his

---

1. In compliance with Fed.R.Civ.P. 56(e), the Creightons opposed Anderson's affidavits and exhibits with several affidavits and exhibits. The Creightons also filed an offer of proof alleging what they could prove through limited discovery.

garage, where his maroon Oldsmobile was parked, one of the officers punched him in the face, knocking him to the ground, and causing him to bleed from the mouth and forehead. Mr. Creighton alleges that he was attempting to move past the officer to open the garage door when the officer panicked and hit him. The officer claims that Mr. Creighton attempted to grab his shotgun, even though Mr. Creighton was not a suspect in any crime and had no contraband in his home or on his person. Shaunda, the Creightons' ten-year-old daughter, witnessed the assault and screamed for her mother to come help. She claims that one of the officers then hit her.

Mrs. Creighton phoned her mother, but an officer allegedly kicked and grabbed the phone and told her to "hang up that damn phone." She told her children to run to their neighbor's house for safety. The children ran out and a plain clothes officer chased them. The Creightons' neighbor allegedly told Mrs. Creighton that the officer ran into her house and grabbed Shaunda by the shoulders and shook her. The neighbor allegedly told the officer, "Can't you see she's in shock; leave her alone and get out of my house." Mrs. Creighton's mother later brought Shaunda to the emergency room at Children's Hospital for an arm injury caused by the officer's rough handling.

During the melee, family members and friends began arriving at the Creightons' home. Mrs. Creighton claims that she was embarrassed in front of her family and friends by the invasion of their home and their rough treatment as if they were suspects in a major crime. At this time, she again asked Anderson for a search warrant. He allegedly replied, "I don't need a damn search warrant when I'm looking for a fugitive." The officers did not discover the allegedly unspecified "fugitive" at the Creightons' home or any evidence whatsoever that he had been there or that the Creightons were involved in any type of criminal activity. Nonetheless, the officers then arrested and handcuffed Mr. Creigh-

ton for obstruction of justice and brought him to the police station where he was jailed overnight, then released without being charged.

The Creightons claim that it was not until during or shortly after the melee that they learned the officers were looking for Vadaain Dixon, Mrs. Creighton's brother, who, unbeknownst to the Creightons, was a suspect in an armed robbery committed several hours earlier that afternoon. They learned that the officers, before arriving at the Creightons' home, had made warrantless searches of the home of Iris Dixon, the mother of Vadaain Dixon and Mrs. Creighton, and the home of Minnie Dixon, the grandmother of Vadaain Dixon and Mrs. Creighton. Anderson claims that he had probable cause to search the homes of Vadaain Dixon's relatives, that it would have been too difficult to get a search warrant because it was nighttime on Veteran's Day, and that he believed that exigent circumstances justified the searches without a search warrant.

The Creightons, individually and on behalf of their children, Shaunda and Tiffany Creighton, then brought this action for compensatory and punitive damages against the City of St. Paul, six St. Paul police officers, FBI agent Russell Anderson, and others unknown to them. The Creightons alleged causes of action under the fourth amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), under 42 U.S.C. §§ 1983 and 1985, and under the tort theories of intentional infliction of emotional distress, assault and battery, false arrest and imprisonment, and negligence. The Creightons brought their action in state court, but it was removed to federal court pursuant to defendant Anderson's petition under 28 U.S.C. §§ 1346 and 1442.

Anderson failed to file an answer, but moved for summary judgment. The dis-

trict court granted the motion [2] on the theory that Anderson was entitled to qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) because, in substance, his warrantless search of the Creightons' home was reasonable.[3]

## II. DISCUSSION.

### A. Introduction.

Recently, in *Welsh v. Wisconsin,* —— U.S. ——, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), the Supreme Court reiterated:

It is axiomatic that "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." * * * And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest. * * * It is not surprising, therefore, that the Court has recognized, as "a 'basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S., [573] at 586 [100 S.Ct. 1371, at 1380, 63 L.Ed.2d 639]. See *Coolidge v. New Hampshire,* 403 U.S. 443, 474–475 [91 S.Ct. 2022, 2042–2043, 29 L.Ed.2d 564] (1971) ("a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show ... the presence of 'exigent circumstances'").

\* \* \* \* \* \*

Consistently with these long-recognized principles, the Court decided in *Payton v. New York, supra,* that warrantless felony arrests in the home are prohibited by the Fourth Amendment, absent probable cause and exigent circumstances. *Id.,* at 583–590 [100 S.Ct.,

at 1378–1382]. At the same time, the Court declined to consider the scope of any exception for exigent circumstances that might justify warrantless home arrests, *id.,* at 583 [100 S.Ct., at 1378], thereby leaving to the lower courts the initial application of the exigent-circumstances exception. Prior decisions of this Court, however, have emphasized that exceptions to the warrant requirement are "few in number and carefully delineated," * * *, and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. Indeed, the Court has recognized only a few such emergency conditions[.]

*Id.* —— U.S. at ——, 104 S.Ct. at 2097 (citations and footnotes omitted).

■ The Creightons contend that the trial court committed three errors in granting Anderson's motion for summary judgment. They argue, first, that the court erred in finding as a matter of law that Anderson had probable cause to believe that Vadaain Dixon was in the Creightons' home at the time of the search and that exigent circumstances justified the lack of a warrant; second, that the court erred in applying the law of summary judgment by failing to draw all inferences in favor of the nonmoving party and by granting summary judgment when there were disputed issues of material fact; and third, that the court erred in granting summary judgment before discovery due to a misapplication of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). After reviewing the affidavits and exhibits of both parties in the light most favorable to the Creightons, we agree that Anderson was not entitled to summary judgment because he has not proved "with such clarity as to leave no room for controversy," *Nix v. Sweeney,* 573 F.2d 998, 1001 (8th Cir.

---

**2.** The district court also granted the motion of the remaining defendants to remand to state court. The Creightons do not appeal from this order.

**3.** The court set forth additional reasons for summary judgment on the Creightons' sections 1983

and 1985 claims against Anderson, and also dismissed the Creightons' state law tort claims against Anderson. Because the Creightons do not appeal from these holdings, we affirm the district court's dismissal of these claims.

1978), *cert. denied,* 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979), that he had probable cause to believe Vadaain Dixon was in the Creightons' home and that exigent circumstances justified his search without a warrant. The record reveals numerous unresolved factual controversies on the issues of probable cause and exigent circumstances which should be resolved by the jury[4] after the Creightons have been given the opportunity for reasonable discovery.

**A.** **There is an unresolved factual controversy over whether Anderson had probable cause to believe Vadaain Dixon was in the Creightons' home on the night of November 11, 1983.**

In *Nix v. Sweeney,* 573 F.2d at 1001, we held that:

> In order to prevail on summary judgment [on the issue of probable cause], the evidence, including admitted facts and disputed facts viewed in the light most favorable to the plaintiff, in the knowledge of the police officer ordering the arrest [or search], *must conclusively establish probable cause. * * * Conflicting evidence on any issue would make that issue a jury question.* [Emphasis added.]

As we stated in *United States v. Taylor,* 428 F.2d 515, 517 (8th Cir.1970), *cert. denied,* 401 U.S. 983, 91 S.Ct. 1208, 28 L.Ed.2d 335 (1971):

> probable cause to search exists when the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that the property to be seized [or subject of the arrest warrant] *will* be found in a particular place or on a particular person. [Emphasis added.]

A mere suspicion that a suspect *might* be in the home of a third party generally will not establish probable cause to search the third party's home. *Steagald v. United States,* 451 U.S. 204, 214–15, 101 S.Ct. 1642, 1648–49, 68 L.Ed.2d 38 (1981); *Rice v. Wolff,* 513 F.2d 1280, 1293 (8th Cir.1975), *rev'd on other grounds sub nom. Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (In response to claim that there was probable cause to believe a suspect was in the searched home on a particular day because he had been known to visit the home in the past, the Court held: "Clearly, such speculation is not a reasonable ground justifying the invasion of citizens' privacy.")

The district court determined that the following information gave Anderson probable cause to believe Vadaain Dixon was at the Creightons' home. On the day before the robbery, Probation Officer William Johnson had told Anderson that Cheryl Dixon, Vadaain's wife, told him on November 1st that she was living at the Creightons' and was using their automobile. Vadaain Dixon also told Johnson, on November 1st, that Cheryl was living with the Creightons and that she picked him up by automobile so that they could spend his day furloughs from a halfway house together. Anderson knew Cheryl Dixon had been arrested for acting as Vadaain's accomplice on prior robberies. Finally, Anderson was allegedly informed by Jamie Dixon, Iris Dixon's son, that the Creightons owned a red or burgundy Oldsmobile, a car allegedly matching the description of the car used in the robbery. This was confirmed by computer shortly before or after Anderson spoke with Jamie Dixon.

We agree with the Creightons that these allegations did not justify summary judgment on the probable cause question because there are several issues for the jury on whether these "facts" would have led an officer of reasonable caution to believe that Vadaain Dixon was in the Creightons' home at the time of the search. First, the pleadings, affidavits, and exhibits submitted

---

**4.** We reject the government's claim that the Creightons waived their right to a jury trial because their motion for jury trial was filed twelve days after the government filed its summary judgment motion. *See* Fed.R.Civ.P. 38(b).

by the Creightons raise an issue of fact as to whether their automobile matched the description of the car used in the robbery. Anderson's affidavit claims: "I also learned from St. Paul police officers who had interviewed witnesses from the neighborhood that the robber had escaped in a car described as a burgundy or maroon over silver car, possibly a Buick. Other witnesses said it was possibly a darker color." Although this description is ambiguous, if factual inferences are to be drawn in the Creightons' favor, it seems to us that Anderson describes a two-tone red *and* silver car such as the red over silver Buick Riviera. The Creightons own a solid maroon Oldsmobile. It is far from clear and, thus, an issue for the jury, whether the description of a two-tone red-and-silver car, possibly a Buick, is a match with a solid maroon Oldsmobile. In any event, the ambiguous description of the car—if it could be considered a match with the Creightons' car—probably describes a significant portion of all the cars in St. Paul, Minnesota.

Additionally, the Creightons sought, but were denied, discovery on two factual issues which might shed light on the description of the car. First, they contend that a St. Paul newspaper reported that the FBI stated that no car had been seen leaving the bank robbery on November 11, 1983. Second, they contend that the police, shortly after arriving at their home, asked their neighbor about a red *and* silver car with a *yellow* license plate. The Creightons' car apparently had white-and-blue Minnesota plates. Thus, upon further discovery and trial on the facts, the Creightons might show that Anderson either had no description of a getaway car or that if he did, it was a description of a two-tone red-and-silver Buick with yellow license plates. This would not justify a search of the Creightons' home because this description does not match their solid maroon Oldsmobile with white-and-blue plates. Given that Anderson's summary judgment memorandum claims that the "most important [evidence establishing probable cause] is the fact that the robbery car strongly resembled one owned by the Creightons," the dispute over

the identification of the car calls for further factfinding and resolution by the jury.

The second basis for Anderson's alleged probable cause determination was that:

I knew from my investigations of previous bank robberies committed by Vadaain Dixon that Sarisse Creighton was Vadaain Dixon's sister. I also knew that Cheryl Ann Donlin Dixon, Vadaain Dixon's wife, had resided with Robert and Sarisse Creighton from May of 1983, after her arrest in Dallas for the Omaha bank robbery, to November 9, 1983, the day Vadaain Dixon jumped his bond. I also knew that Vadaain Dixon has stayed on a daily basis at the house of Robert and Sarisse Creighton with Cheryl Ann Donlin Dixon during his four-hour furloughs from the Volunteers of America residence from October 13 to approximately November 9, 1983.

Before discussing the Creightons' arguments that these claims are untrue and based on unreliable double hearsay, we note their point that defendant Anderson was informed of all these "facts" on November 10, 1983, the day before the search, and one day after Anderson learned that Vadaain Dixon had failed to return to the Volunteers of America halfway house. Because the government bases its argument regarding probable cause and exigent circumstances on these alleged "facts" and on how Vadaain Dixon was a dangerous fugitive, a serious question is raised why these facts did not lead Anderson to obtain a warrant for a search—preferably in the daytime—of the Creightons' home on November 10, 1984.

Recognizing the force of this argument, the government concedes that these alleged "facts" did not establish probable cause that Vadaain Dixon might be at the Creightons' home. However, they contend that these suspicions amount to probable cause when considered in conjunction with the alleged match of the Creightons' car with the alleged getaway car. We have already discussed the need for more factfinding on the car identification dispute;

here, we note that there is substantial force in the Creightons' attack on Anderson's claim that Vadaain Dixon might be at the Creightons because Cheryl Dixon allegedly had lived with the Creightons in the several months preceding the robbery.

First, Sarisse and Robert Creighton's sworn affidavits claim that although Cheryl Dixon had lived with them for two weeks in the summer of 1983, she had not resided at their home at any time thereafter. They also have included in the summary judgment exhibits all of Vadaain Dixon's furlough cards from the Volunteers of America halfway house which contradict Anderson's claim that Vadaain had visited the Creightons on a daily[5] basis from October 13 to November 9, 1983, and support the claim that Cheryl Dixon was not living with the Creightons.

Second, the Creightons claim that Anderson's information is unreliable double hearsay. Anderson alleges that he obtained the information on November 10, 1983, from Federal Parole Officer William Johnson who allegedly obtained it ten days earlier when Vadaain and Cheryl Dixon allegedly told him that Cheryl was living at the Creightons and occasionally using their car. The Creightons note that even the government admits that Cheryl and Vadaain Dixon are totally untrustworthy and unreliable. They argue it is not implausible the Dixons would have lied to their parole officer that Cheryl was living with a respectable family and attending a nearby beautician's school. This raises an issue for the jury because "if hearsay declarations are used to establish probable cause, the [officer must show that he had] a 'substantial basis' for crediting the hearsay declara-

tions." *People v. Love,* 168 Cal.App.3d 104, 109, 214 Cal.Rptr. 483 (1985) (citing *Jones v. United States,* 362 U.S. 257, 270, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960); *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965)).

Third, even if Anderson was justified in relying on the information he obtained from Johnson, Anderson is unreasonable in claiming that it showed that Cheryl Dixon was living at the Creightons up to November 9. At best, his information suggested that Cheryl Dixon might have been living at the Creightons' home up to November 1. Moreover, even if one assumes that Cheryl Dixon was living at the Creightons' up to November 9, this does not necessarily show that Vadaain Dixon would have been at the Creightons' on November 11.

In sum, there are significant factual disputes about the truthfulness and quality of the "facts" behind Anderson's alleged probable cause determination. Summary judgment on this issue was unjustified because the government did not "conclusively establish probable cause." *Nix,* 573 F.2d at 1001.

**C. There is a question of fact whether exigent circumstances justified Anderson's lack of a search warrant.**

█ The trial court accepted Anderson's three claims why exigent circumstances justified his warrantless search of the Creightons' home. First, the court found that Anderson was in "hot pursuit" of a suspect. This was error because the evidence does not establish "hot pursuit" as a matter of law.[6] Recently in *Welsh v. Wis-*

---

5. The record contains twenty-seven furlough cards filled out by Vadaain Dixon from October 13, 1983 to November 9, 1983. On October 15, 1983, Vadaain Dixon listed as destinations for his four-hour leave: 1) Iris Dixon; 2) Cheryl Dixon at Creightons; and 3) Janice Robertson. On October 17, 1983, Vadaain listed: 1) Har-Mar Mall; 2) Iris Dixon; 3) Cheryl Dixon at the Creightons; and 4) McDonalds. On October 18, 1983, Vadaain listed: 1) Iris Dixon; and 2) Cheryl Dixon at the Creightons. The Creightons' address is not noted as a possible destination on any of the remaining twenty-four furlough

cards. Thus, even if Cheryl Dixon had visited the Creightons for three days and Vadaain had briefly visited her there, Vadaain Dixon's furlough cards show that he had not been at the Creightons for over three weeks prior to the robbery.

6. We reject Anderson's argument that the Creightons' appeal "should be dismissed because they have not briefed an independent ground for the trial court's ruling, i.e., [that] * * * Anderson was in hot pursuit of an armed and dangerous felon." The Creightons, by arguing

*consin,* —— U.S. ——, 104 S.Ct. at 2098, the Court held that the police were not in "hot pursuit" of a suspect "because there was no immediate or continuous pursuit of the [petitioner] from the scene of a crime." *See also United States v. Morgan,* 743 F.2d 1158 (6th Cir.1984) (Court upholds motion to suppress evidence, rejecting "hot pursuit" exception because, although the officers followed the suspect from the scene of a crime, they stopped at a coffee shop for approximately twenty minutes to plan the arrest). In *United States v. Santana,* 427 U.S. 38, 43, 96 S.Ct. 2406, 2410, 49 L.Ed.2d 300 (1976), the Court held that " 'hot pursuit' means some sort of a chase." In the case at hand, no evidence in the record supports a claim that Anderson was in "immediate or continuous pursuit" of Vadaain Dixon or that Anderson was involved in "some sort of a chase." Rather, Anderson had not seen Dixon's getaway car and had, at best, minimal evidence that Dixon might have fled to the Creightons' home. Anderson cites no case which supports a holding as a matter of law that there was "hot pursuit" on facts similar to the case at hand. This issue should be resolved by the jury under proper instructions from the court on the limited situations where "hot pursuit" may be found.

■ Second, the trial court suggested that, as a matter of law, the possibility of destruction of evidence justified Anderson's lack of a warrant. For this exception to apply, the officer must show that he had some actual and reasonable basis for believing that evidence would be destroyed. *United States v. Perez,* 700 F.2d 1232, 1237 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3587, 82 L.Ed.2d 884 (1984) ("We

have more recently stated that '[t]o justify a warrantless entry based on imminent destruction of evidence, factual circumstances must demonstrate a sufficient basis for an officer to believe somebody in the residence will likely destroy evidence. * * * *Mere fear or apprehension will not justify a warrantless entry of a private home.'* " [Emphasis added and citation omitted.]); *United States v. Kulcsar,* 586 F.2d 1283 (8th Cir.1978); *United States v. Moreno,* 701 F.2d 815, 818 (9th Cir.1983) (Because the possibility of destruction of evidence exists in every case, there must be some evidence to support the suspicion if the lack of a search warrant is to be excused.) As the Creightons point out, Anderson's affidavit does not mention that he feared that evidence would be destroyed. The *post hoc* speculations of Anderson's counsel that Dixon might have destroyed evidence if he had been in the Creightons' home apparently were not factors in Anderson's decision to conduct the search. Moreover, there is no evidence to support the speculation. Accordingly, the trial court erred in finding that the possibility of "destruction of evidence" justified the lack of a warrant. This issue should be resolved by the jury upon proper instructions from the court.

■ Finally, the trial court found that exigent circumstances existed under the six factor analysis set forth in *Dorman v. United States,* 435 F.2d 385 (D.C.Cir. 1970).[7] *See also, e.g., United States v. Kulcsar,* 586 F.2d 1283, 1287 (8th Cir.1978). We agree with the Creightons that this was error because there is a factual dispute for the jury's resolution on whether exigent circumstances existed under the *Dorman*

that exigent circumstances did not justify the lack of a warrant, have sufficiently raised the point that Anderson was not in "hot pursuit" of a suspect. *See Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) (referring to "hot pursuit" as an example of an exigent circumstance); *Dorman v. United States,* 435 F.2d 385, 391 (D.C.Cir.1970) (en banc) (same).

7. These factors are:
(1) That a grave offense is involved, particularly a crime of violence;

(2) the suspect is reasonably believed to be armed;
(3) a clear showing of probable cause;
(4) a strong reason to believe that the suspect is in the dwelling;
(5) the likelihood of escape if not swiftly apprehended;
(6) a peaceable entry as opposed to a "breaking;" and
(7) the time of entry (night or day).
*Dorman,* 435 F.2d at 392–93.

analysis. It is for the jury to decide whether Anderson had a "strong reason" to believe that Vadaain Dixon was in the Creightons' home at the time of the search, and whether there was a likelihood of Dixon's escape if the search was delayed until a warrant was obtained. *See Wallace v. King,* 626 F.2d 1157, 1161 (4th Cir.1980), *cert. denied,* 451 U.S. 969, 101 S.Ct. 2045, 68 L.Ed.2d 348 (1981); *United States v. Glover,* 555 F.Supp. 604 (D.D.C.1982), *affirmed,* 725 F.2d 120 (D.C.Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 1682, 80 L.Ed.2d 157 (1984). There is also a disputed issue of fact for the jury on whether Anderson's entry was peaceable. If the Creightons can prove that the officers did not ask for permission to enter and did not explain their mission but simply told Mr. Creighton to "keep his hands in sight" while they entered his home with guns ready, then, on the facts of this case, the jury could find that the entry was not peaceable.

In sum, we believe that this case calls for additional factfinding on whether exigent circumstances justified Anderson's lack of a warrant.

### III. QUALIFIED IMMUNITY.

■ Because we have decided that there is a jury question on whether Anderson violated the Creightons' fourth amendment rights, we must reach the question whether Anderson is nonetheless immune from damages under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[8]

In *Harlow,* the Supreme Court held that "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Anderson argues that, under *Harlow,* he is entitled to immunity from damages if his conduct was "objectively reasonable." However, this mis-

states the standard. *Harlow* does not give courts unguided discretion to determine what conduct is or is not objectively reasonable. Instead, the *Harlow* Court stated that the first inquiry of the qualified immunity analysis is whether, assuming that the government defendant violated plaintiffs' constitutional or statutory rights as they are presently defined, did the defendant's conduct "violate *clearly established* statutory or constitutional rights of which a reasonable person would have known" of at the time of the alleged violation? 457 U.S. at 818, 102 S.Ct. at 2738 (emphasis added). The Court then stated that "if the law was clearly established, the immunity defense ordinarily should fail since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–19, 102 S.Ct. at 2738–39.

Anderson admits he knew that he could not search for Vadaain Dixon in the Creightons' home unless he had probable cause to believe that Dixon was in the Creightons' home and that "exigent circumstances" justified his failure to obtain a warrant. He argues, however, that the meaning of "exigent circumstances" was not clearly established on November 12, 1983. We disagree.

In our previous discussion, we set forth a few of the numerous cases detailing the "few * * * emergency conditions," *Welsh,* —— U.S. at ——, 104 S.Ct. at 2097, which will justify a warrantless search of a home. We find that the Creightons' fourth amendment rights and the "exigent circumstances" doctrine were "clearly established" on November 11, 1983. Anderson has cited no persuasive reason why he could reasonably have been unaware of this clearly established law.

Reversed and remanded for further proceedings consistent with this opinion.

---

**8.** Although the trial court believed that it was deciding the *Harlow* issue, it only addressed the question of whether Anderson violated the con-

stitution and never really reached the immunity issue.