Allen L. **FLUDD**

v.

**UNITED STATES SECRET SERVICE,** et al. Maurice Daugherty, et al., Appellants.

No. 85–5336.

United States Court of Appeals, District of Columbia Circuit.

Sept. 13, 1985.

Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Rebecca L. Ross, Asst. U.S. Attys., Washington, D.C., were on the petition for writ of mandamus.

Clausen Ely, Jr., David F. Williams, Arthur B. Spitzer and Elizabeth Symonds, Washington, D.C., were on the opposition.

Before WALD and MIKVA, Circuit Judges, and McGOWAN, Senior Circuit Judge.

PER CURIAM:

This case presents the novel question of the district court's authority to hold a "factual hearing" on the issue of qualified immunity when, on the basis of the affidavits before the court, "the present record is not entirely clear and there are, indeed, some contradictions in the record." *Fludd v. United States Secret Service*, Civ. No. 82–2172 (D.D.C. Feb. 28, 1985) (order). By order dated April 15, 1985, a divided panel of this court granted petitioners/appellants' petition for writ of mandamus preventing the district court from holding the factual hearing. We now issue this opinion to explain more fully the reasons for the court's decision.

## I. BACKGROUND

On August 3, 1982, respondent/appellee Allen A. Fludd (hereinafter Fludd or plaintiff) filed suit in the United States District Court for the District of Columbia against the United States Secret Service and six of its agents [1] (hereinafter defendants). The gravamen of Fludd's complaint was that defendants had violated his Fourth Amendment rights in the service of a subpoena for a handwriting exemplar. Plaintiff invoked the court's jurisdiction under 28 U.S.C. § 1331 (1982) and 28 U.S.C. § 2201 (1982) and sought $10,000 in compensatory

---

1. The individual defendants are Maurice Daugherty, Thomas LaFarree, Frank O'Donnell, Robert Hall, H. Stuart Knight, and Richard Keiser.

damages and $25,000 in punitive damages against the individual agents and declaratory relief against the Secret Service.

The facts which precipitated plaintiff's complaint can be briefly summarized.[2] In late 1978, Zeno Kittrell, plaintiff's stepfather, contacted Special Agent LaFarree of the Secret Service regarding the alleged theft of a tax return check. At the time of this initial contact, Mr. Kittrell was living at the family home at 609 Nicholson St., N.W., Washington, D.C., with his wife, Martha Kittrell, plaintiff, and plaintiff's son. In January 1979, Mr. and Mrs. Kittrell separated. At that time, Mr. Kittrell left some furniture, clothes and books in the house but removed all of his other belongings. Although Mr. Kittrell claims he intended to reclaim at least some of the remaining property, plaintiff alleges that he removed all of the possessions he intended to keep when he moved out in January. Mr. Kittrell also removed the telephone and had the number transferred to his new apartment. Although he continued to come to the house until April to collect his mail, in February Mrs. Kittrell changed the locks on all the doors and henceforth Mr. Kittrell was allowed in only with her permission. Mr. Kittrell did not enter the house between April and August and never removed any additional belongings.

On February 7, 1979, after Mr. Kittrell had moved out of the home, Special Agent LaFarree conducted a phone interview with Mr. Kittrell. During the interview, Mr. Kittrell stated that Fludd might have stolen the check. Following an investigation, on July 16, 1979, LaFarree interviewed Fludd at the Nicholson Street address. LaFarree asked Fludd to provide a handwriting sample. Claiming he knew nothing about the check, Fludd refused, but stated he would provide a handwriting sample if LaFarree followed proper legal procedures. On July 17, 1979, LaFarree obtained a subpoena for a handwriting exemplar returnable on August 7, 1979.

On August 3, 1979, at approximately 8:30 p.m., LaFarree, accompanied by Special Agent O'Donnell, went to the Nicholson Street address to serve the subpoena.[3] LaFarree knocked hard on the door several times. Although a light was on and LaFarree heard music or a television, there was no answer. Believing that Mr. Kittrell still lived at the Nicholson Street address, LaFarree contacted the dispatcher and asked the dispatcher to call the house to see if anyone was home. The dispatcher notified LaFarree that Mr. Kittrell was there and that he would be right down. When Mr. Kittrell had not appeared ten minutes later, LaFarree again called the dispatcher. The dispatcher again called Mr. Kittrell. The dispatcher then informed LaFarree that Kittrell no longer lived at the Nicholson Street address but would come over shortly to let them in.

According to defendants, when Mr. Kittrell arrived, he informed the agents that although he no longer lived there, he still owned the house and still had some of his possessions inside. He told the agents that he did not have his key with him but that he would let them in through the back door. After waiting for Special Agents Hall and Daugherty to arrive as backup, and briefing them on the situation, LaFarree and O'Donnell followed Mr. Kittrell around to the back of the house. Instead of going to the back door, however, Mr. Kittrell led the agents into the house through a basement door. Although defendants contend that the door was unlocked, both Mrs. Kittrell and Fludd state that it was their habit to keep the basement door locked.

Fludd, who had been listening to a radio in an upstairs bedroom, thought he heard some noise downstairs. Clad only in his undershorts, he went to investigate. While Fludd was standing in the kitchen, LaFarree, followed by Mr. Kittrell and O'Donnell, emerged from the basement stairs. Agent

---

2. For purposes of this opinion, we have assumed plaintiff's version of the facts.

3. Agent LaFarree states that several previous attempts to serve the subpoena had been unsuccessful.

LaFarree was armed with a "large handgun." He pointed the gun at Fludd, ordered him to "freeze," and served him with the subpoena. A brief argument ensued in which Fludd questioned the authority of Mr. Kittrell and the agents to enter the home. Agent Hall entered the home briefly and shortly thereafter Mr. Kittrell and the agents left. Fludd provided the handwriting exemplar on August 7, and was subsequently cleared of any suspicion in the alleged theft of the check.

As previously stated, Fludd filed his complaint on August 3, 1982. More than two years later, on August 17, 1984, the six individual defendants moved for summary judgment. On the basis of affidavits from Mr. Kittrell and all the agents involved the defendants argued that there were no material facts in dispute and that, based on the undisputed facts, they were entitled to qualified immunity under the standards set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). On September 17, 1984, Fludd filed an opposition to the motion for summary judgment. On the basis of affidavits from Fludd and Mrs. Kittrell, Fludd argued that material issues of fact were in dispute and that, therefore, summary judgment on the issue of qualified immunity was inappropriate. On October 16, 1984, defendants filed their reply.

On February 28, 1985, the district court deferred consideration of the summary judgment motion and scheduled a "factual hearing" on the validity of Mr. Kittrell's consent. The court found that "[o]n that issue, the present record is not entirely clear and there are, indeed, some contradictions in the record." The court proposed to hear testimony from all the relevant witnesses

> to explore (1) the authority of Zeno Kittrell to grant entry to 609 Nicholson Street to the agents, (2) the agents' belief regarding Mr. Kittrell's authority and the reasonableness of that belief on

the basis of the surrounding circumstances, and (3) the agents' reasons for serving the subpoena at the time and place they did.

*Fludd v. United States Secret Service*, Civ. No. 82–2172 (D.D.C. Feb. 28, 1985) (order). Defendants moved for reconsideration arguing that the procedure was, in effect, a trial on the issue of liability without the opportunity for discovery. On March 8, 1985, the district court denied the motion. Defendants then filed a notice of appeal and sought a stay from the district court pending appellate review. The motion for stay was denied on April 5, 1985, and defendants filed a Petition for Writ of Mandamus and Emergency Motion for Stay with this court. On April 15, 1985, this court granted defendants' Petition for Writ of Mandamus and directed the district court to "cancel the evidentiary hearing" and to "resolve any uncertainties in the record which may prevent the district court from determining whether material facts are in dispute" by directing "the parties to submit additional affidavits."[4] *Fludd v. United States Secret Service*, Nos. 85–5336, 85–1221 (D.C.Cir. Apr. 15, 1985) (order).

## II. DISCUSSION

We begin our discussion with the Supreme Court's recent pronouncement on the issue of qualified immunity, *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow*, the Court adopted an objective test for qualified immunity:

> government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738. In explaining this new standard, the Court stated:

---

**4.** Following our decision, on April 16, 1985, the district court issued an order cancelling the evidentiary hearing and directing the parties to submit supplemental affidavits and papers within 10 days. Although the additional information has now been received, no decision has yet been issued on the qualified immunity question.

Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Id.* at 818–19, 102 S.Ct. at 2738 (footnotes omitted).

In this case, plaintiff claims that his Fourth Amendment right to be secure in his home from unreasonable searches and seizures has been violated. As the Supreme Court has recently stated "[i]t is axiomatic that 'the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984), *quoting United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). It has long been settled that nighttime entries are particularly intrusive, *Jones v. United States,* 357 U.S. 493, 498, 78 S.Ct. 1253, 1256, 2 L.Ed.2d 1514 (1958), and that warrantless searches are *per se* unreasonable, subject only to a few "jealously and care-

fully drawn" exceptions. *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

■ Not surprisingly, defendants rely on one of these exceptions, consent, to justify their actions. They argue that Mr. Kittrell, a co-owner of the property, properly authorized their entry for purposes of serving the subpoena. In *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Court held that consent can be obtained from a third party with "common authority" over the property. *Id.* at 171, 94 S.Ct. at 993. However, a "mere property interest" is insufficient. Rather, common authority rests on the

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7. Therefore, although the standards for consent are "clearly established," the difficulty arises because the legal conclusion that a proper consent was given is necessarily dependent on an analysis of the particular facts in each case. Thus, while *Harlow* speaks in terms of neat categories of questions of law and questions of fact, the issue of consent does not easily fit into either category.

■ The district court's solution to this difficult problem was to hold a factual hearing on the issue of qualified immunity. In keeping with *Harlow*'s admonition that questions of qualified immunity should be resolved before trial and without extensive discovery, the district court proposed to hear testimony from all the witnesses to enable it to determine whether Mr. Kittrell had actual authority to consent to the entry, whether the agents' belief that he had such authority was reasonable, and what the reasons were for serving the subpoena at the time and place they did. While we

do not hold that the district court can never hold a hearing to clarify whether material issues of fact with respect to the issue of qualified immunity are actually in dispute,[5] we conclude that the district court's proposed hearing in this instance exceeded the permissible limits of such a hearing.

The evident purpose of the district court's proposed hearing, as the dissent acknowledges, was not to determine *whether* material issues of fact were in dispute but rather to *resolve* any factual disputes necessary to allow resolution of the qualified immunity question. As the court stated in *Harlow*, however, "Rule 56 of the Federal Rules of Civil Procedure provides that disputed questions of fact ordinarily may not be decided on motions for summary judgment." *Harlow*, 457 U.S. at 816, 102 S.Ct. at 2737. Particularly in a case such as this where discovery has been limited, "[I]n determining whether summary judgment is proper, a court ordinarily must look at the record in the light most favorable to the party opposing the motion, drawing all inferences most favorable to that party." *Id.* at 816 n. 26, 102 S.Ct. at 2737 n. 26.

Thus, as outlined in our earlier order, we think the proper procedure for the district court to follow at this juncture is first to decide whether there are any material facts in dispute that are necessary to its legal conclusion that qualified immunity lies. If no material facts are in dispute and on the basis of the undisputed facts it can make its decision on qualified immunity, it should do so. Likewise, if material facts are in dispute, but looking at those facts "in the light most favorable to [Fludd] ..., drawing all inferences most favorable to that party," *id.*, it can still decide that immunity lies, it may grant summary judgment for the defendants. But if, considering the undisputed facts and/or the disputed facts in the light most favorable to Fludd, it cannot find, as a matter of law, that defendants violated no clearly established constitutional right of the plaintiff, summary judgment on the issue of qualified immunity is inappropriate, and the parties should be afforded the opportunity to establish the factual predicates for their contentions by discovery and trial.

For the above reasons the petition for writ of mandamus was granted.

MIKVA, Circuit Judge, dissenting:

I dissent from the order and opinion of my colleagues because I think nothing in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) was intended to deprive a federal judge of the power to obtain the necessary facts to resolve questions presented to him. This power can be exercised by requesting affi-

---

**5.** Although agreeing that the use of an evidentiary hearing to resolve the qualified immunity issue is "somewhat novel," plaintiff cites *Green v. White*, 693 F.2d 45 (8th Cir.1982), *cert. denied*, 462 U.S. 1111, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983), as authority for the proposition that such a hearing is not unprecedented. In *Green*, plaintiff filed a complaint under 42 U.S.C. § 1983 (1982), claiming that White, the superintendent of a Missouri prison, had denied him his constitutional right to freely practice his religion. The district court dismissed the complaint as frivolous, and the Eighth Circuit reversed and remanded the case for an evidentiary hearing. *Green v. White*, 605 F.2d 376 (8th Cir.1979), *cert. denied*, 444 U.S. 1083, 1093, 100 S.Ct. 1038, 1060, 62 L.Ed.2d 767, 782 (1980). Following a second dismissal, appeal, and remand, *Green v. White*, 628 F.2d 1126 (8th Cir. 1980), the defendant moved for summary judgment on the basis of qualified immunity but the district court went ahead and held the evidentia-

ry hearing. At the hearing, the testimony demonstrated that no material issues of fact were in dispute. On the basis of these undisputed facts, the district court properly concluded that White had not violated any "clearly established rights" of the plaintiff. *Green v. White*, 693 F.2d at 48.

Thus, while we continue to believe that in light of *Harlow's* admonition, issues of qualified immunity should be resolved whenever possible, prior to discovery, *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738, and without resort to evidentiary hearings, we do not believe that *Green* is inconsistent with our decision, for the summary judgment was ultimately based on undisputed facts. This view of *Green* is strengthened by the Eighth Circuit's more recent decision in *Creighton v. City of St. Paul*, 766 F.2d 1269 (8th Cir. 1985), in which the same court reversed the grant of a summary judgment motion granting qualified immunity and remanded the case for trial because material issues of fact were in dispute.

davits or admissions, or by holding a preliminary hearing. To insist that the judge proceed to a full-scale trial of the main cause of action before the preliminary question of immunity can be resolved defeats much of the purpose of *Harlow*, which was to allow immunity matters to be resolved at the earliest and least intrusive point in the case. We do defendants no favor by sending this matter back under an order to resolve disputed facts without a hearing. The concern that defendants will be deprived of discovery if the trial judge finds no immunity could be met by treating the judge's findings on immunity as preliminary, subject to additional evidence presented at trial. To force the trial before knowing the facts on immunity negates the efficacy that *Harlow* was intended to provide. I would allow the judge to proceed as he had ordered.