869 F.2d 384
 Norma GINTER, Appellant,
v.
James STALLCUP, Individually and in his official capacity;
Lawrence County, Arkansas; James Blasingame;
Jack Knox, Appellees,
Boone County, Arkansas
Tom Lee; City of Ravenden, Arkansas, Appellees.
Roy Norvell.
 No. 88-1130.
 United States Court of Appeals,
Eighth Circuit.
 Submitted September 21, 1988.
Decided March 6, 1989.
Rehearing and Rehearing En Banc Denied April 19, 1989.
 
 Kay DeMailly, Little Rock, Ark., for Stallcup.
 Richard Pence, Little Rock, Ark., for Blasingame & Knox.
 David White, North Little Rock, Ark., for City of Ravenden, Ark.
 Richard A. Jarboe, Walnut Ridge, Ark., for Lawrence County, Ark.
 Before HEANEY* and BOWMAN, Circuit Judges, and ROSS, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This civil rights action emerged from the attempted apprehension of Gordon Wendall Kahl by federal, state and local law enforcement officers at the residence of Leonard and Norma Ginter, near Smithville, Arkansas, on June 3, 1983.
 
 
 2
 Kahl, then a federal fugitive charged with the murders of two Deputy United States Marshals, fled to Arkansas, hiding in Norma Ginter's residence. James Blasingame, F.B.I. Special Agent in Charge of the State of Arkansas, obtained a search warrant authorizing a search of the house. Several F.B.I. agents, federal marshals, state troopers and local police officers travelled to Ginter's residence. During their attempt to apprehend Kahl, Ginter's house was burned to the ground. As a result, Ginter lost all of her personal possessions. She and her husband were arrested, charged and convicted in federal court for harboring Kahl. The Ginters were also charged in state court with capital murder for the death of Lawrence County Sheriff Gene Matthews, who was killed in the arrest attempt. The capital murder charge was later dropped.
 
 
 3
 On May 17, 1985, Norma Ginter instituted a civil rights action against the named defendants, alleging that her personal possessions had been destroyed when Blasingame allowed or ordered Lawrence County Deputy Tom Lee and other law enforcement officials to intentionally set her residence on fire in contravention of state arson statutes and the fourth and fourteenth amendments to the United States Constitution.[1] She also alleged that Lawrence County Prosecutor James Stallcup violated her constitutional rights by illegally arresting her, charging her with capital murder and defaming her.
 
 
 4
 On appeal, Ginter alleges that the district court erred in dismissing Lawrence County and the City of Ravenden from the suit and in granting qualified immunity to James Blasingame, F.B.I. Agent Jack Knox,[2] and Tom Lee for the destruction of Ginter's residence. 641 F.Supp. 939 (1986). She also challenges the dismissal of her state arson claims and the dismissal of all claims against Stallcup. After an exhaustive review of the record, we affirm the district court's decision to dismiss Knox, to dismiss the arson claims,[3] and to dismiss any claims against Stallcup.[4] While we also affirm the district court's decision to grant qualified immunity to Blasingame and Lee, we do so for different reasons.
 
 I. BACKGROUND
 
 5
 Ginter alleges that the defendants, either directly or indirectly, participated in setting her residence on fire, destroying all of her personal possessions. She alleges that the use of fire was an unnecessary and unconstitutional use of force.
 
 
 6
 The defendants, through a series of exhibits and affidavits, concede that Lawrence County Sheriff Gene Matthews, Deputy U.S. Marshal Jim A. Hall and Arkansas State Trooper Ed Fitzpatrick entered the Ginter residence in search of Gordon Kahl. They allege, however, that Kahl shot Matthews after they entered the kitchen. All three men fled and F.B.I. agents then began firing tear gas projectiles and rifle fire into the house in an attempt to effectuate Kahl's arrest. Tom Lee testified that he sought out diesel fuel and, upon the orders of F.B.I. agents at the scene, introduced it, along with tear gas grenades and smoke canisters, into a roof vent on the top of the Ginter residence. Blasingame, the F.B.I. agent in charge, denies, however, participating in any plan to set the residence on fire. He stated in an affidavit that he ordered the use of tear gas after Matthews, Fitzpatrick and Hall fled from the house because he believed someone inside the house was shooting at them with an automatic weapon, but he denies participating in the attempt by Lee and other F.B.I. agents to use diesel fuel to force Kahl out of the house.
 
 II. PUBLIC POLICY
 
 7
 The district court found that public policy precluded Ginter, who had been convicted for harboring a fugitive in the residence, from using "the courts to recover for damage to her home caused by law enforcement officials' pursuit of that felon." The district court relied on United States v. James Lee Smith, 659 F.2d 97 (8th Cir.1981) to support its holding that Ginter could not recover her lost property because the act of harboring Kahl "occasioned the necessity for the actions which occurred on June 3, 1983." We disagree with the district court's reliance on this case and find it inapplicable to the present factual circumstances.
 
 
 8
 In James Lee Smith, Smith entered into an agreement with an undercover police officer to purchase thirty pounds of hashish for the amount of $64,000. During the sale, Smith gave a $25,000 down payment to the police officer. After the arrest and conviction of Smith, the government retained possession of the money. The government then filed a declaratory judgment seeking a ruling that the money was the property of the United States. Smith asserted that he had given the undercover police officer the cash pursuant to a contract and that he had a right to the money under the principles of contract law. This Court held that it would violate public policy "to permit the courts to be used by * * * wrongdoer[s] * * * to obtain the property * * * voluntarily surrendered as part of [an] attempt to violate the law." James Lee Smith, 659 F.2d at 100. The Court found the agreement between Smith and the police officer to be an illegal contract and unenforceable in court. Id.
 
 
 9
 While we agree with the district court that felons should not be able to rely on the court system to enforce illegal contracts, we disagree that James Lee Smith precludes a convicted felon from suing law enforcement officers who destroy private property in violation of the fourth amendment. First, the issue in James Lee Smith was whether the court could enforce an illegal agreement to purchase hashish, not whether the court could hold police officers liable for using unreasonable force to effectuate a search warrant. Second, even though Ginter illegally hid Kahl in her home, that action did not cause the destruction of her personal possessions. Ginter may have voluntarily broken the law, but she did not voluntarily surrender her personal possessions to the police. Police officers may not avoid liability for unconstitutional behavior merely by asserting that a criminal deserved to be a recipient of such treatment. Public policy does not prohibit persons convicted of felonies from using the courts to protect their constitutional rights. Thus, we hold that public policy would not preclude Ginter from recovering for lost personal possessions if she could show that the use of the diesel fuel violated her fourth and fourteenth amendment rights.
 
 III. QUALIFIED IMMUNITY
 
 10
 Ginter challenges the decision to grant qualified immunity to Blasingame and Lee before allowing her to conduct discovery in this case. Government officials performing discretionary functions are shielded from liability for civil damages, and even from intrusive discovery proceedings in civil suits, if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). A defense of qualified immunity is defeated, however, if an official knew or should have known that his actions, taken within the sphere of official responsibility, would violate the constitutional rights of the plaintiff or if he took the action with the malicious intention to cause a deprivation of constitutional rights. Harlow, 457 U.S. at 815, 102 S.Ct. at 2736.
 
 
 11
 On summary judgment, the trial court must first determine whether the law prohibiting the alleged police conduct was clearly established at the time it occurred. Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. If the law at that time was not clearly established, an official could not reasonably be expected to know that the law forbade such conduct. Id.
 
 
 12
 Second, a trial court must determine whether the police conduct, as alleged by the plaintiff, constituted actions that a reasonable officer could have believed lawful. Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (a police officer may not be held personally liable unless a reasonable officer, possessing the information of the searching officer, could not have believed the actions allegedly taken were lawful). If so, the defendant is entitled to dismissal prior to discovery. If not, and the parties disagree as to what actions the police officers took, then discovery may be necessary before the defendant's motion on qualified immunity can be resolved. Anderson v. Creighton, 483 U.S. at --- n. 6, 107 S.Ct. at 3042 n. 6, 97 L.Ed.2d at 535 n. 6. Yet the Supreme Court cautioned: "One of the purposes of the Harlow qualified immunity standard is to protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government.' " Id. Thus, discovery should occur on the issue of qualified immunity only if the parties disagree as to what actions the law enforcement officers took and if the plaintiff can present some evidence to support her allegations. Mere allegations, without more, do not create a question of fact as to qualified immunity.
 
 
 13
 The district court examined each of Ginter's allegations and determined that no evidence existed to indicate that "any of the law enforcement officers knew or believed that Mr. Kahl was dead when the fire commenced." It also found that, even assuming Blasingame ordered the use of diesel fuel on Ginter's residence,
 
 
 14
 [t]he use of fire to force an armed suspect, who is reasonably believed to be an armed and dangerous murderer, out of a house has not been shown by Ms. Ginter to violate any statutory or constitutional right which had been "clearly established" prior to June 3, 1983.
 
 
 15
 Although we agree with the district court that Blasingame and Lee are immune from suit, we reach that result on different grounds. It is clear that if Blasingame and Lee knew or believed Kahl was dead before the fire started, any direct participation in the destruction of Ginter's residence by fire after that time would violate Ginter's fourth amendment right to be free from an unnecessarily destructive search and seizure. See Dalia v. United States, 441 U.S. 238, 258, 99 S.Ct. 1682, 1693, 60 L.Ed.2d 177 (1979) (the manner in which a warrant is executed is subject to judicial review as to its reasonableness); Tarpley v. Greene, 684 F.2d 1, 9 (D.C.Cir.1982) (destruction of furniture, wall paneling, and tape deck during search violates Fourth Amendment if not necessary to effectively execute search warrant); Duncan v. Barnes, 592 F.2d 1336, 1338 (5th Cir.1979) (destruction of doors, television and tape recorder by police while executing valid search warrant is subject to Fourth Amendment reasonableness standard; there is no constitutionally cognizable distinction between a "search" for items and a "securing of the premises" during execution of a warrant). Thus, any destruction caused by law enforcement officers in the execution of a search or an arrest warrant must be necessary to effectively execute that warrant.[5]
 
 
 16
 Contrary to the finding of the district court, we believe the law prohibiting unnecessarily destructive behavior while searching a citizen's home was clearly established in 1983. If Blasingame or Lee knew Kahl was dead before the fire was started, and if Blasingame ordered the use of the diesel fuel with that knowledge, their actions clearly would have been unreasonable. If such were the case, no qualified immunity should have been granted.
 
 
 17
 After an exhaustive review of the record, however, we do not find any support whatsoever for Ginter's allegations that either Blasingame or Lee knew of Kahl's death. It is true that Blasingame was in charge of the arrest operation. It is also true that he ordered the F.B.I. SWAT Team to shoot tear gas into the Ginter residence, but he states he did this on the assumption that someone was shooting an automatic weapon from inside the Ginter residence. Although we have, in this case, a dispute as to what occurred after Ginter was taken from the scene, Ginter has not presented this Court with any evidence indicating that Blasingame or Lee had learned of Kahl's death. Thus, in our opinion, Ginter has been unable to create a question of fact which would warrant further discovery.
 
 
 18
 Ginter argues, however, that even if Blasingame and Lee believed Kahl was alive, they should remain liable for damages, as the use of diesel fuel to accelerate a fire in the house was an unreasonable use of force. Ginter submitted the affidavit of Roy Jesse Paul, a state certified arson investigator and member of the Houston, Texas Fire Department, who stated that his training indicated that "no law enforcement purpose would be served by the addition of accelerants to a residence." The decision to use diesel fuel on the house appears to have been that of F.B.I. Agent Jim Handley, the leader of the F.B.I. SWAT Team on the scene. Lee, who merely followed Handley's orders, testified that he had no reason to believe that his actions were unlawful. Blasingame denies even knowing about the use of the fuel to smoke Kahl out of the building. The record also indicates that the F.B.I. agents believed Kahl to be armed and dangerous, as he was the prime suspect in the killing of two U.S. marshals in North Dakota. Kahl was, in fact, heavily armed. A search of the debris after the fire resulted in the recovery of five rifles, two shotguns, and two magazines.
 
 
 19
 The district court considered all of these facts and held that Ginter had not shown how the use of fire to force an armed fugitive out of a house violated her constitutional rights. Implicit in its holding is the determination that Ginter failed to create a jury question as to whether Blasingame or Lee acted unreasonably that night. We do not disagree with this finding.
 
 
 20
 Because Ginter has failed to show that either Blasingame or Lee knew of Kahl's death before the fire or that either of them acted unreasonably while attempting to effectuate his arrest, we affirm the district court's grant of summary judgment in their favor.
 
 IV. CONCLUSION
 
 21
 Based on our discussion above, we affirm the district court's grant of summary judgment in favor of appellees Knox, Blasingame and Lee on the grounds of qualified immunity. We also affirm the district court's grant of summary judgment in favor of appellee Stallcup on the basis of absolute immunity and the other grounds set forth in the district court's opinion. Furthermore, we affirm the district court's grant of the City of Ravenden's motion to dismiss and Lawrence County's motion for summary judgment on the basis of the district court's opinion. We reverse only that portion of the district court's decision which found that public policy prevented Ginter from recovering for her lost property.
 
 
 22
 HEANEY, Senior Circuit Judge, concurring.
 
 
 23
 Although I agree that there is insufficient evidence in this record to show that either Blasingame or Lee knew that Gordon Kahl was dead before the fire started, I believe the record does give some support to Ginter's allegations. Thus, I would go a step further than my colleagues. My views are based on the following from the record:
 
 
 24
 First, Kahl's autopsy report indicates that he was killed at approximately 5:58 p.m. by a bullet from Sheriff Matthews' .41 caliber handgun. The autopsy report also concludes that Kahl was killed before the fire started. There is also some support for Ginter's allegation that Kahl's body had somehow been dismembered. Tom Lee testified at his deposition that when he found Kahl's body after the fire was extinguished, "there were no arms or legs attached" to the corpse. This Court, in United States v. Udey, 748 F.2d 1231, 1235 (8th Cir.1984), wrote that "[t]he body of a man burned beyond recognition was also discovered; it was later identified by the Medical Examiner as Gordon Kahl." Although we said nothing about Kahl's body being dismembered in Udey, none of the defendants in this case have disputed Ginter's statements. The autopsy report indicates that Kahl's right arm and both legs were fractured; an addendum to the report states that Kahl's charred foot was delivered to the medical examiner on June 29, 1983, by Lawrence County Deputy Perry Webb, almost a month after the shootout occurred.
 
 
 25
 Second, there is no evidence in this record, nor have any of the defendants alleged, that anyone other than Matthews, Hall, or Fitzpatrick was present in the house after Kahl was shot and before the fire was extinguished. On June 9, 1983, Norma Ginter gave a statement to the Lawrence County Sheriff's Department that only she, Leonard Ginter, and Gordon Kahl were in her house on June 3, 1983. Thus, after the Ginters were taken from the scene, the only people in the house were Matthews, Hall, Fitzpatrick and Kahl. Finally, Ginter heard someone scream, "We need more fuel!" before she was arrested and removed from the area. These facts, undisputed by the defendants, support Ginter's theory of the case.
 
 
 26
 Furthermore, I believe that the district court erred when it held that no facts exist to support Ginter's allegation that any of the law enforcement officers knew of Kahl's death. Sheriff Matthews entered the house at approximately 5:55 p.m. and must have shot Kahl in the back of the head soon thereafter, as Kahl died from the gunshot wound at 5:58 p.m. Thus, it is possible that Matthews knew when he left the house that Kahl was dead. Two other men, U.S. Marshal Jim Hall and Arkansas State Trooper Ed Fitzpatrick, entered Ginter's residence with Matthews. The record indicates that Hall talked to Matthews after they fled from the house. This evidence raises the possibility that a trier of fact could find that Fitzpatrick or Hall either saw Kahl being shot or learned of Kahl's death from Matthews before Matthews was taken to the hospital. If these men knew of Kahl's death and allowed the destruction of the house to proceed, they would not be protected from suit.
 
 
 27
 Thus, although I agree with the district court that Ginter failed to indicate how Blasingame or Lee can be attributed with the knowledge of Kahl's death, I disagree with the district court that Ginter failed to create a question of fact as to whether any of the other law enforcement officers knew that Kahl was dead at the time the diesel fuel was used on Ginter's residence.
 
 
 28
 I would agree that, if Kahl had been alive and shooting at the law enforcement officers from the house, the amount of force used to effectuate his arrest may have been reasonable. But the autopsy report shows that Kahl was not alive after 6:00 p.m. I do not make this point to minimize the heinousness of Kahl's crimes. I merely wish to point out that, if an allegedly armed and dangerous fugitive is killed during an arrest attempt and law enforcement officers are aware of that fact, any further use of destructive force becomes unnecessary, unreasonable and unconstitutional.
 
 
 
 *
 The HONORABLE GERALD W. HEANEY assumed senior status on January 1, 1989
 
 
 [1]
 Ginter brought the case under 42 U.S.C. Sec. 1983, alleging that the defendants had violated Arkansas arson statutes, Ark.Crim.Code Secs. 41-1902, 41-1903, 41-1905. The district court allowed Ginter to proceed against Blasingame and Knox under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), rather than under section 1983, because the F.B.I. agents were carrying out their duties as federal law enforcement officials at the time of the fire, and not acting under color of state law. The claim against Lee proceeded under section 1983
 
 
 [2]
 Jack Knox was the F.B.I. Agent who supplied Blasingame with the information of Kahl's location. He did not participate in the attempted arrest
 
 
 [3]
 We have struggled to understand the legal basis for Ginter's allegations of arson under Arkansas law. Ginter appears to argue that the defendants are subject to civil liability for violating Arkansas arson statutes. Under A.S.A. 41-1954, however, an individual may not seek civil damages unless the defendants have been charged or convicted of that crime. Lamb v. Hibbard, 228 Ark. 270, 306 S.W.2d 859, 861 (1957). As none of the defendants in this case have been so charged, Ginter has no independent state law claim. Ginter also appears to argue that the defendants should not be granted qualified immunity because they violated state arson laws. The focus of a section 1983 or a Bivens action is not whether the defendants' actions violated local law. Rather, the focus must be whether their actions deprived Ginter of any right protected by the Constitution or laws of the United States. Paul v. Davis, 424 U.S. 693, 700, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). "Neither federal nor state officials lose their immunity by violating a clear command of a statute--of federal or of state law--unless that statute provides a basis for the cause of action sued upon." Davis v. Scherer, 468 U.S. 183, 194, n. 12, 104 S.Ct. 3012, 3019 n. 12, 82 L.Ed.2d 139 (1984). Thus, Ginter's assertions that defendants violated Arkansas arson statutes is irrelevant unless their behavior also violated a clearly established constitutional right
 
 
 [4]
 Stallcup cannot be held liable for the destruction of Ginter's personal possessions, as he was not present at the Ginter residence during the arrest attempt. Ginter's defamation charge was also correctly dismissed. It arose from a report, printed in the Harrison Daily Times, which attributed to Stallcup a statement that Ginter was guilty of capital murder. The newspaper later printed a correction indicating that it had erroneously attributed to Stallcup a statement made by another person. We agree with the district court that Ginter's failure to offer any other specific defamatory statements made by Stallcup warranted a dismissal of the defamation claim. We agree that Ginter's claims of illegal arrest and "illegal incarceration" are meritless as Stallcup had nothing to do with her arrest or the conditions of the jails in which she was incarcerated
 The district court correctly held that Stallcup's decision to prosecute Ginter for the murder of Sheriff Gene Matthews did not render him personally liable to Ginter. Prosecutors are absolutely immune from a civil suit for damages under section 1983 as long as the actions complained of appear to be within the scope of prosecutorial duties. Imbler v. Pachtman, 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976) (initiation of a criminal prosecution); Myers v. Morris, 810 F.2d 1437, 1446 (8th Cir.1987) (conduct during adversarial proceedings); Keating v. Martin, 638 F.2d 1121, 1122 (8th Cir.1980) (attempt to suppress evidence at trial). Stallcup's decision to prosecute Ginter was within the scope of his duties as prosecutor and he is absolutely immune from suit.
 Ginter alleged that Stallcup violated her right to have the capital murder charge submitted to a grand jury. We agree that there is no constitutional right to have a criminal charge presented to a grand jury, as the Fifth Amendment grand jury requirement is not applicable to the states. James v. Reese, 546 F.2d 325, 327-28 (9th Cir.1976). Under Arkansas law, a prosecution may be instituted either by a grand jury indictment or by an information filed by the prosecutor. A.C.A. Sec. 16-85-302 (1987). Stallcup's motion to dismiss was correctly granted on this issue.
 
 
 [5]
 The district court and the defendants place much reliance on language in Steele v. City of Houston, 603 S.W.2d 786 (Tex.1980) in which the Supreme Court of Texas held that the city was not immune from liability for the damage caused to private property by police officers who fired incendiary devices into a house in an attempt to recapture escaped convicts. In Steele, the plaintiffs sued for compensation under the Texas Tort Claims Act and the takings clause of the Texas Constitution. After interpreting the takings clause, the state Supreme Court stated:
 The City argues that the destruction of the property as a means to apprehend escapees is a classic instance of police power exercised for the safety of the public. We do not hold that the police officers wrongfully ordered the destruction of the dwelling; we hold that the innocent third parties are entitled by the [State] Constitution to compensation for their property.
 
 
 [603]
 S.W.2d at 793 (emphasis added)
 The district court and the defendants, quoting this paragraph out of context, use this case to support the position that the defendants' actions were lawful. The case does not hold that all destructive force used to apprehend escapees is lawful under the fourth and fourteenth amendments of the U.S. Constitution. It merely acknowledges that this issue was not before it.