724 F.Supp. 654 (1989)
Robert E. CREIGHTON, Jr., and Sarisse Creighton, husband and wife, individually, and on behalf of their minor children, Shaunda Creighton and Tiffany Creighton, Plaintiffs,
v.
Russell ANDERSON, Defendant, et al.
Civ. No. 4-84-162.
United States District Court, D. Minnesota, Fourth Division.
July 14, 1989.
*655 John P. Sheehy, Meshbesher, Singer & Spence, Minneapolis, Minn., for plaintiffs.
Jon M. Hopeman, Asst. U.S. Atty., Minneapolis, Minn., for Russell Anderson.
Lawrence J. Hayes, Jr., Asst. City Atty., St. Paul, Minn., for other defendants.

MEMORANDUM OPINION AND ORDER
DIANA E. MURPHY, District Judge.
This case already has a lengthy procedural history. In 1984 this court granted defendant Russell Anderson's motion for summary judgment.[1]See Memorandum Opinion and Order, Civil 4-84-162 (D.Minn. July 17, 1984). Plaintiffs appealed to the Court of Appeals which reversed. Creighton v. City of St. Paul, 766 F.2d 1269 (8th Cir.1985). The Supreme Court granted certiorari and vacated the judgment of the Court of Appeals and remanded the case for further proceedings. Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Plaintiffs allege that defendant violated their constitutional rights by entering their home without their consent or a search warrant. Now before the court is defendant's renewed motion for summary judgment based on qualified immunity.
After this case was remanded from the Eighth Circuit, the parties disputed whether discovery should be permitted before the motion was considered, and if so, how much. A hearing was held to explore these positions in light of the Supreme Court's decision.[2] Plaintiffs sought to discover documents and to depose defendant Anderson and United States Probation Officer William Johnson. Defendant argued that no discovery was needed and that the qualified immunity defense is designed to protect officials from unnecessary discovery. After considering the arguments of the parties, the record in the case, and the comments of the appellate courts, the court permitted plaintiffs to depose Anderson and to review his field notes. Plaintiffs' requests for further discovery were considered and denied. After a hearing the motion was taken under advisement.

I.
The background may be understood from the affidavits of Robert and Sarisse Creighton, Minnie and Iris Dixon, Russell *656 Anderson, William Johnson, Michael Goergen, exhibits attached to the affidavits of counsel, and the deposition of Russell Anderson. On defendant's motion for summary judgment, however, all disputed material facts and inferences must be viewed in plaintiffs' favor. Agristor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir.1987). Summary judgment may be entered only if no material facts are in dispute and defendant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).
On Friday, November 11, 1983, Minnesota Federal Savings and Loan on Grand Avenue in St. Paul was robbed by an armed man at about 3:30 in the afternoon. Defendant Russell Anderson, an agent of the Federal Bureau of Investigation (FBI), was called at his home shortly after the robbery was reported.[3] Anderson and two other agents went directly to the bank where they interviewed bank tellers and other witnesses, and conferred with St. Paul police officers. They obtained a description of the robber and how the robbery was carried out. They were at the bank from about 4:30 to 6:30 p.m.
By the time Anderson left the bank, he suspected that Vadaain Dixon had committed the robbery based on the physical description of the robber and other knowledge. Anderson knew from FBI records that Dixon had a history of armed robberies and was a fugitive. He knew that Dixon had recently pled guilty to bank robberies and had been assigned to community custody at the Volunteers of America (VOA) while awaiting sentencing. Anderson was informed of Vadaain Dixon's activities at the VOA through probation officer William Johnson. Johnson had advised the FBI early in the morning of November 10, 1983 that Dixon had failed to return to the VOA the previous evening. Johnson affidavit ¶ 4. Johnson told Anderson on November 10 that Cheryl Dixon, Vadaain's wife, had reported living with the plaintiffs, Robert and Sarisse Creighton and their children, during October and November 1983. Sarisse Creighton is Vadaain Dixon's sister. Johnson had reported that Cheryl Dixon had been using the Creightons' car to pick up Vadaain from the VOA on his daily furloughs. Johnson affidavit ¶¶ 4-6.[4] Anderson also knew on November 11 that a fugitive warrant had been issued for Dixon's arrest. He knew that Cheryl Dixon had admitted driving the get-away car in two prior bank robberies. He knew also that Vadaain's brother, Jamie Dixon, had once driven Vadaain to Milwaukee following a Minnesota robbery. Anderson affidavit ¶ 10.
Anderson went directly from the bank to the St. Paul police department to arrange a photo lineup. The lineup was conducted at about 8:00 p.m. Both witnesses identified Vadaain Dixon's photo as depicting the robber. After the identification was made, Anderson and several officers returned to the field to look for Vadaain Dixon.[5] Plaintiffs contend that the situation was not as urgent as defendant portrays. They point out that even before the robbery, on November 10, 1983, the FBI knew of Vadaain Dixon's criminal record and that he was a fugitive. They claim that the November 11 robbery did not add much urgency to the situation.
At some early point in his investigation on November 11, 1983, Anderson was told by St. Paul police officers that witnesses had identified the get-away car as burgundy or maroon over silver, possibly a Buick. Anderson was also told that one witness thought the car was possibly darker. Anderson affidavit ¶ 6.
*657 Shortly after concluding the photo lineup, Anderson and several St. Paul police officers went to the home of Iris and Jamie Dixon (Vadaain's mother and brother respectively). Anderson sought Jamie Dixon's cooperation regarding information about his brother Vadaain. The officers searched that residence at 676 Dayton in St. Paul; they did not find Vadaain Dixon. The record is unclear whether they obtained consent for the search, but Jamie Dixon told Anderson that the Creightons owned a 1977 Oldsmobile Cutlass, red or burgundy in color. Anderson affidavit ¶ 11. Jamie Dixon also gave Anderson the addresses of other relatives and descriptions of their automobiles. Id. at ¶ 10. At some point Anderson did a computer run to obtain information describing the Creightons' car. He does not recall whether this was before or after searching the home of Iris and Jamie Dixon.
Defendant and St. Paul officers went next to the home of Minnie Dixon, Vadaain's grandmother. They searched her home with consent and left shortly after 8:30 p.m.
They then went directly to the Creighton home and arrived at about 8:40 p.m. Some officers went to the rear of the home while Anderson approached the front door with others. Some officers were uniformed and some were not; several officers carried shotguns. Robert Creighton states that he saw search lights outside his home and went to the front door. The officers entered without asking for consent. Robert Creighton states that when he asked the police for a search warrant, a sergeant replied, "We don't have a search warrant. I don't need a search warrant. You watch too much T.V." Robert Creighton affidavit, p. 2. The police searched through the home while Anderson remained on the main floor with Robert Creighton. Sarisse Creighton came downstairs very upset. She was shouting and crying and told her children to leave the house. At some point during the search, Robert Creighton was accompanied by officers to the attached garage because they wanted to view the car. It is undisputed that on the way to the garage Robert Creighton was struck in the mouth by a St. Paul police officer, drawing blood. Robert Creighton states that he was struck by this officer without provocation. The search of the Creighton home lasted about 20 minutes. Vadaain Dixon was not found.

II.
Plaintiffs believe defendant's warrantless entry and search of their home was a violation of their constitutional rights. Defendant contends that he is entitled to summary judgment on the basis of qualified immunity under Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
Qualified immunity is designed to protect from liability government officials who perform discretionary functions "if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ginter v. Stallcup, 869 F.2d 384, 387 (8th Cir.1989). The defense is a broad one; it shields "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 344-45, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986). "Qualified immunity is an affirmative defense for which the defendant has the burden of proof." Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir. 1989), (citing Harlow v. Fitzgerald, 457 U.S. at 800, 102 S.Ct. at 2727). It is generally determined by the court as a matter of law. Moiser v. Blum, 875 F.2d 202, 204 (8th Cir.1989) (citing Mitchell v. Forsyth, 472 U.S. 511, 527-29, 105 S.Ct. 2806, 2816-17, 86 L.Ed.2d 411 (1985)). The inquiry is fact specific, however, in that the defense must be considered in light of the information the official knew at the time he acted. Anderson v. Creighton, 107 S.Ct. at 3040. The issue should be resolved as early in the litigation as possible. Id. at 3042 n. 6.
The standard for evaluating a qualified immunity claim was discussed by the Supreme Court in this case. Id. at 3039. It requires a two-part inquiry. First, a government official is immune from liability unless the constitutional right which has *658 allegedly been violated was "clearly established." Id. That is, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id.; see, e.g., Johnson-El v. Schoemehl, 878 F.2d at 1048 (addressed the "threshold" immunity question of whether rights were clearly established).[6]
The second step involves considering the "objective legal reasonableness" of the defendant's conduct in light of the information which the official possessed at the time of the alleged violation. Anderson v. Creighton, 107 S.Ct. at 3040; McIntosh v. Arkansas Republican Party, 856 F.2d 1185 (8th Cir.1988). The inquiry is objective only; the defendant's subjective intent is irrelevant. Anderson v. Creighton, 107 S.Ct. at 3040; see Meyers v. Morris, 810 F.2d 1437, 1455 (8th Cir.), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987). This second step is the focus of the parties' arguments on this motion for summary judgment.
The Supreme Court opinion indicated how the immunity issue should be considered by this court.
[O]n remand, it should first be determined whether the actions the Creightons allege Anderson to have taken are actions that a reasonable officer could have believed lawful. If they are, then Anderson is entitled to dismissal prior to discovery. If they are not, and if the actions Anderson claims he took are different from those the Creightons allege (and are actions that a reasonable officer could have believed lawful), then discovery may be necessary before Anderson's motion for summary judgment on qualified immunity grounds can be resolved.
Anderson v. Creighton, 107 S.Ct. at 3042 n. 6 (citation omitted).
There is no dispute about what actions defendant took  all parties agree that he conducted a warrantless nighttime entry into the Creighton home in search of Vadaain Dixon. No other of defendant's actions are challenged here. The dispute centers on the objective reasonableness of defendant's asserted belief that Dixon would be found in the Creighton home. If no reasonable officer, with the information Anderson possessed, could have believed that Dixon was in the Creighton home, then Anderson should not be entitled to qualified immunity. See id. at 3040. Plaintiffs also dispute whether a reasonable officer with Anderson's information could have believed that exigent circumstances existed.[7]
Plaintiffs have conducted discovery from defendant concerning what he did relative to the search and what information he relied *659 upon. They now contend that defendant had no reliable first-hand information linking Vadaain Dixon to the Creighton home. They contend that Anderson knew that the description of the get-away car was not identical to the description of the Creighton car which he had obtained from Jamie Dixon and from the police computer. They claim that information from probation officer William Johnson linking Vadaain and Cheryl Dixon to the Creighton home was outdated and in any event inherently unreliable. They claim that no reasonable officer would have linked Cheryl Dixon to the bank robbery itself and that therefore her connections to the Creighton home should not have been considered.
In some instances plaintiffs misstate the undisputed record as to the information which Anderson had. Plaintiffs contend, for instance, that Anderson's only information linking Vadaain Dixon to the Creighton home was through furlough cards on which Dixon reported his daily destination and that the cards were inaccurate. Robert Creighton's affidavit states that neither Cheryl nor Vadaain Dixon had been to his home for many months before the date of the search. Plaintiffs do not claim, however, that Anderson was aware of this contention. The unrebutted record is that William Johnson had been told personally and at different times by both Cheryl and Vadaain Dixon that she was living at the Creighton home, and that he passed this information on to Anderson. See Johnson affidavit ¶¶ 5-6; Anderson affidavit ¶ 12. It was objectively reasonable for Anderson to believe that the information from Johnson was trustworthy. Plaintiffs have not presented any evidence which suggests that Anderson possessed and acted upon information other than that about which he has testified. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also Ginter v. Stallcup, 869 F.2d at 388 (plaintiff opposing summary judgment on qualified immunity must present evidence that information upon which the officer relied involves a factual dispute).
Plaintiffs also contend that the only connection between Dixon and the Creightons upon which a reasonable agent would rely are the daily furlough cards. This ignores Anderson's knowledge that Sarisse Creighton is Vadaain Dixon's sister. Johnson also told Anderson that Cheryl and Vadaain Dixon spent most day furloughs at the Creighton home and that Cheryl Dixon used the Creightons' car to pick up Vadaain from the VOA most days from October 13 until at least November 1, 1983. Johnson affidavit ¶¶ 5-6; Anderson affidavit ¶ 12. Johnson told Anderson that Cheryl Dixon had reported living at the Creighton home from May 1983 while she was on bond from an arrest in Dallas for another bank robbery.[8] Plaintiffs do not dispute that Anderson possessed this other information on November 11. An investigating agent could reasonably rely on information from a probation officer under the circumstances presented, even if it ultimately were to be proven inaccurate. See, e.g., Ginter v. Stallcup, 869 F.2d at 389.
Plaintiffs argue that Cheryl Dixon's contacts with the Creighton home are irrelevant because she was not implicated in the St. Paul bank robbery.[9] The fact that she was not implicated in the robbery is only one of the many pieces of information known to Anderson and on which any reasonable investigating agent could rely. Cheryl Dixon was married to Vadaain Dixon, the prime suspect. She had reported to William Johnson on November 1, 1983 that she was seeing him daily at the VOA. Johnson passed this information to Anderson on November 10, 1983. Anderson knew from his previous investigations that Cheryl Dixon had admitted to assisting Vadaain in two bank robberies earlier in 1983. Anderson affidavit ¶ 7. This information could reasonably have suggested to Anderson that Vadaain Dixon *660 was likely to be found where Cheryl Dixon was staying.
Plaintiffs claim that there is a fact dispute regarding Anderson's information that the Creightons owned a car similar to the description of the get-away car.[10] The undisputed evidence is that there were some differences and some similarities between the get-away car described by witnesses and the Creighton car described by Jamie Dixon and by the police computer run. Exactly matching descriptions were not required to create a reasonable suspicion regarding the Creighton car. See United States v. Jones, 430 F.Supp. 219, 226 (W.D.Pa.1977), aff'd, 591 F.2d 1337 (3d Cir.1979). Anderson had been told by William Johnson that Vadaain Dixon had been using the Creightons' car almost daily up until November 1, 1983. Under these circumstances an investigating agent could reasonably suspect that the Creighton car had been the get-away car.
Plaintiffs claim that the police entry was not peaceful and that this mitigates against any determination that the Dorman factors were met. It is undisputed that Sarisse Creighton became upset towards the officers after they had entered. It is also undisputed that Robert Creighton was struck in the face by an officer.[11] On this motion the court adopts his version of the facts which is that he was struck without provocation. These incidents occurred after the initial entry, however. Robert Creighton states that he met the police at the door and the police walked right in. Robert Creighton does not claim that he resisted the police entry except for inquiring about their warrant. An officer in Anderson's position could reasonably have believed that the entry could be conducted peacefully. The alleged violence occurred after the entry.
Anderson had several discrete leads connecting Vadaain Dixon to the Creighton home. When any one is viewed in isolation, in the light most favorable to plaintiffs, and in hindsight, it is possible to discredit the objective reasonableness of Anderson's conclusion that probable cause existed to believe Dixon was in the Creighton home and that exigent circumstances existed. The evidence should not be viewed in isolation, however, but rather in the totality of circumstances which an agent confronts in the field and in the course of an evolving and fast-changing situation. That is the very purpose for affording qualified immunity to law enforcement agents  to allow them to exercise their discretion, even to make reasonable misjudgments, so long as their conduct, when viewed objectively, does not show that they are plainly incompetent or intentionally violating the law. See Malley v. Briggs, 475 U.S. at 344-45, 106 S.Ct. at 1098.
The circumstances giving rise to this case are unfortunate. Plaintiffs suffered a serious disruption of their household and an intrusion into their privacy. The sanctity of a home should not be invaded lightly, particularly at night by armed officers. When it does occur, the circumstances of the officers' conduct should be closely scrutinized. At the same time, however, law enforcement officers are protected by qualified immunity if their conduct is objectively reasonable.
*661 A careful consideration of the record leads to the conclusion that Anderson is entitled to summary judgment as a matter of law. Most of the facts about what Anderson knew on November 11, 1983 are undisputed. Based upon those facts and accepting plaintiffs' version of the disputed facts as true, defendant's search of the Creighton house was objectively reasonable. An officer knowing what Anderson did could reasonably have concluded that there was probable cause that Vadaain Dixon was at the Creighton home on November 11, 1983 and that exigent circumstances existed to search the home that night. On this record Anderson is entitled to summary judgment on his qualified immunity defense.

ORDER
Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that defendant's motion for summary judgment is granted.
NOTES
[1] It also granted an unopposed motion to remand to state court plaintiffs' claims against the remaining defendants (the City of St. Paul and some of its police officers). The remand was not appealed, and those claims are apparently still pending in state court. See Creighton v. City of St. Paul, 766 F.2d 1269, 1272 n. 2 (8th Cir.1985).
[2] The Supreme Court noted that

[o]ne of the purposes of the Harlow [v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)] qualified immunity standard is to protect public officials from the "broad-ranging discovery" that can be "peculiarly disruptive of effective government." For this reason ... qualified immunity questions should be resolved at the earliest possible stage of a litigation.
Anderson v. Creighton, 107 S.Ct. at 3042 n. 6 (citation omitted). The Court directed this court to determine
whether the actions the Creightons allege Anderson to have taken are actions that a reasonable officer could have believed lawful. If they are, then Anderson is entitled to dismissal prior to discovery. If they are not, and if the actions Anderson claims he took are different from those the Creightons allege (and are actions that a reasonable officer could have believed lawful), then discovery may be necessary before Anderson's motion for summary judgment on qualified immunity grounds can be resolved. Of course, any such discovery should be tailored specifically to the question of Anderson's qualified immunity.
Id. (citation omitted).
[3] November 11, 1983 was Veterans Day, a federal holiday, and most government agencies were closed.
[4] Johnson states in his affidavit that the information regarding Cheryl Dixon living at the Creightons and using their car was derived from both Vadaain and Cheryl Dixon whom he met in person at separate times. Johnson affidavit. ¶¶ 5-6.
[5] Anderson states that he unsuccessfully tried to contact Assistant United States Attorneys Heffelfinger and Symchych, and that he advised his FBI supervisor of the investigation's progress. Anderson does not claim that he attempted to contact any state or federal court to obtain a search warrant for any of the homes searched.
[6] The parties here do not dispute the first stage of the inquiry, namely that the constitutional issues regarding probable cause to search and exigent circumstance were "clearly established" in November 1983.

In 1970 the Eighth Circuit stated that probable cause to conduct a search exists when "facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that [the person sought] will be found in a particular place...." United States v. Taylor, 428 F.2d 515, 517-18 (8th Cir.1970), cert. denied, 401 U.S. 983, 91 S.Ct. 1208, 28 L.Ed.2d 335 (1971).
The Eighth Circuit in 1974 adopted the "Dorman factors" as a guide to determining whether exigent circumstances exist:
(1) seriousness of the alleged offense; (2) reasonable belief that the suspect is armed; (3) clear showing of probable cause to believe that the suspect committed the alleged offense; (4) strong reason to believe that the suspect is on the premises; (5) likelihood that the suspect will escape if not swiftly apprehended; and (6) entry may be made peaceably.
Salvador v. United States, 505 F.2d 1348, 1351-52 (8th Cir.1974) (citing Dorman v. United States, 435 F.2d 385, 392-93 (D.C.Cir.1970)).
[7] As to exigent circumstances, plaintiffs contend that there was no clear showing of probable cause which would lead Anderson to believe that Dixon was in the Creighton home and that the entry was not peaceful. See Dorman v. United States, 435 F.2d at 392-93. Plaintiffs do not dispute the objective reasonableness of Anderson believing that the other Dorman factors were met. There is no dispute that the bank robbery was a serious offense, that by 8:40 p.m. on November 13 there was more than probable cause to believe that Vadaain Dixon was the bank robber, that it was reasonable to believe that he was armed and dangerous, or that he was likely to leave the area quickly. See id.
[8] Plaintiffs claim that Anderson should have believed that Cheryl Dixon lived during the summer and fall of 1983 with her parents in Edina. Anderson had interviewed Cheryl Dixon there, but there is no evidence that he was ever told that she was living with her parents.
[9] Plaintiffs emphasize that witnesses reported that the driver of the get-away car was a male.
[10] They claim that Anderson knew before arriving at the Creighton home that one witness described the get-away car as having a yellow license plate with numbers different from the Creightons' blue and white Minnesota plate. They also claim that Anderson knew the color of the Creighton car (solid maroon or burgundy Oldsmobile Cutlass) differed from the car described by witnesses (a burgundy or maroon over silver, possibly a Buick). Anderson affidavit ¶¶ 6, 11, 12. Anderson's affidavit testimony about what he knew is consistent with his deposition testimony on that topic. Compare Affidavit paragraphs 10-12 with deposition pages 28-29. Under plaintiffs' unsupported version of what Anderson knew, however, a reasonable agent could suspect that the Creighton car was the get-away car based on similarities in the descriptions which are undisputed in the record. This could reasonably have been strengthened by the knowledge that Cheryl and Vadaain Dixon had been using the Creighton car just days before the robbery.
[11] The circumstances regarding this alleged assault should be thoroughly aired in plaintiffs' state court proceedings against the City of St. Paul and individual police officers.