Robert E. CREIGHTON, Jr. and Sarisse Creighton, husband and wife, individually, and on behalf of their minor children, Shaunda Creighton and Tiffany Creighton, Appellants,

v.

Russell ANDERSON, Appellee.

No. 89–5479.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1990.

Decided Dec. 17, 1990.

John P. Sheehy, Minneapolis, Minn., for appellants.

Jon M. Hopeman and Robert M. Small, Asst. U.S. Attys., Minneapolis, Minn., for appellee.

Before JOHN R. GIBSON, Circuit Judge, and ROSS and HENLEY, Senior Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

The fourth amendment claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), of Robert E. Creighton, Jr. and his wife Sarisse, individually and on behalf of their minor children, are before us again. The district court[1] granted summary judgment in favor of Russell Anderson in 1984, which this court reversed on appeal, *Creighton v. City of St. Paul*, 766 F.2d 1269 (8th Cir. 1985). The Supreme Court in turn reversed the judgment of this court and remanded for further proceedings, particular-

---

1. The Honorable Diana Murphy, United States District Judge for the District of Minnesota.

ly with respect to the issue of qualified immunity. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The district court, after allowing limited additional discovery, again granted summary judgment in favor of Anderson on the basis of qualified immunity. *See Creighton v. Anderson,* 724 F.Supp. 654 (D.Minn.1989). The Creightons appeal again, arguing that qualified immunity was not available to Anderson because a reasonable officer would not have searched the Creighton home without a search warrant, that the law of the case precludes summary judgment and, if it does not, that sufficient factual issues remain to prevent it. Finally, the Creightons argue that their discovery was unduly restricted. We affirm.

The Creightons' claims arise out of Anderson's warrantless search of their home in quest of a bank robber. Because the procedural posture of this case is an appeal from summary judgment, we state the facts in the light most favorable to the plaintiffs, as did the district court, *see Anderson,* 724 F.Supp. at 656–57, and we review the district court's decision de novo, *Suburban Newspapers v. Kroger Co.,* 886 F.2d 1060, 1061 (8th Cir.1989). Because the inquiry is whether Anderson is entitled to qualified immunity, we focus on facts that were known to Anderson at the time he undertook his search. *See Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. at 3039 (question is whether a reasonable officer could have believed Anderson's warrantless search lawful in light of information the searching officers possessed).

On November 11, 1983 at 3:30 in the afternoon an armed man robbed the Minnesota Federal Savings and Loan. Anderson, an FBI agent, received a call at home shortly after the robbery. He went to the bank to investigate and there obtained descriptions of the robber and the robbery, including the getaway car. Anderson left the bank at about 6:30 in the evening, with the suspicion that Vadaain Dixon was the robber.

Dixon had recently pleaded guilty to charges on four armed bank robberies and had been in custody at the Volunteers of America halfway house, awaiting sentencing. Anderson was the FBI officer in charge of Dixon's earlier robbery cases. Anderson already knew that on November 9, Dixon had failed to return to custody from a daytime furlough and was therefore a fugitive on November 11. Anderson also knew Dixon was drug dependent and had a history of robbery with guns going back to 1974. Furthermore, he knew Dixon had tried to run over a police officer while escaping from an earlier robbery. The physical description of the robber Anderson received at Minnesota Federal matched Dixon's characteristics. Anderson went from the bank to the St. Paul police department where two witnesses independently picked Dixon's picture out of a photo lineup at about 8:00 p.m.

Anderson and several officers set out to look for Dixon.[2] They first went to the home of his mother, Iris Dixon, where they encountered Jamie Dixon, Vadaain's brother, who was known to have driven a getaway car for Vadaain after a previous robbery. They did not find Vadaain at his mother's house, but they obtained from Jamie the addresses of several of Vadaain's relatives and descriptions of their cars. Sarisse Creighton, Vadaain's sister, was one of those relatives.

Anderson and the officers next went to Vadaain's grandmother's house. She consented to their search of her house, but they were unable to find Vadaain there.

At this point, Anderson possessed the following information suggesting that Vadaain would be at the Creightons' house:

1. Witnesses had described the get away car as burgundy or maroon over silver, possibly a Buick, possibly a darker color, and Jamie Dixon had just described the Creightons' car as

---

**2.** Before leaving the station house, Anderson tried unsuccessfully (it being a holiday) to contact an assistant United States attorney about obtaining search warrants. FBI policy required him to go through an assistant United States attorney instead of going directly to a judge for the warrant. App. B–131–32, 152.

a 1977 Oldsmobile, red or burgundy in color.

2. On November 10 Anderson had spoken to Vadaain's probation officer William Johnson. Johnson told Anderson that he had spoken earlier to Cheryl Dixon, Vadaain's wife, and that she reported that she had been living with the Creightons because their house was near a beauty school where she was a student, and that she had used the Creightons' car to pick up Vadaain on his daily furloughs. Vadaain himself had also told Johnson that Cheryl was living at the Creightons. Furlough cards he had filled out indicated that he had occasionally spent time at the Creightons' during his day furloughs. Johnson generally relayed the information from the furlough cards to Anderson as they came in.

3. Cheryl Dixon had admitted driving the getaway car for Vadaain in two prior bank robberies.

After leaving the grandmother's house, Anderson and the officers went to the Creighton house at about 8:40 p.m. without a search warrant. Some officers went to the back of the house, while Anderson and others went to the front door. Several of the officers carried shotguns. Robert Creighton answered the door. The officers entered without asking Creighton's consent. Mr. Creighton testified that when he asked the officers for a search warrant, they said: "We don't have a search warrant. I don't need a search warrant; you watch too much TV." The officers entered the house peaceably. However, Mr. Creighton testified that later, when he was taking the officers to the garage to view their car, as Mr. Creighton tried to get past one of the officers to reach the garage door, the officer hit him. Mrs. Creighton testified that officers also struck and shook one of her daughters. The Creightons do not contend that Anderson was involved in the assaults.

### I.

■ The Creightons claim that Anderson's actions violated their right to be free of a warrantless search of their home where no exigent circumstances existed. Anderson claims that he is entitled to qualified immunity because a reasonable officer, possessing the information he possessed, could have believed exigent circumstances did exist. *See Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. at 3039. Once the plaintiff has demonstrated that the law governing the plaintiffs' rights was clearly established at the time of the defendant's acts, the defendant has the burden of proof with respect to all other elements of the qualified immunity defense. *Johnson–El v. Schoemehl,* 878 F.2d 1043, 1048 (8th Cir.1989).

The district court held that the undisputed facts showed Anderson was entitled to summary judgment. The Creightons argue on appeal that summary judgment should not have been entered for Anderson because there are disputed facts that would make a difference to the outcome and that even the facts as stated by the district court do not show that Anderson acted reasonably.

■ Whether a given set of facts entitles the defendant to qualified immunity is a question of law, *see Garionis v. Newton,* 827 F.2d 306, 309 (8th Cir.1987); *E–Z Mart Stores, Inc. v. Kirksey,* 885 F.2d 476, 477 (8th Cir.1989), which may be decided on summary judgment. However, if there is a dispute over facts that might affect the outcome of the suit under the law of qualified immunity, there can be no summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

*Dorman v. United States,* 435 F.2d 385, 392–93 (D.C.Cir.1970), provides the legal framework for determining whether Anderson's search was lawful. This circuit has adopted *Dorman's* balancing test for determining whether exigent circumstances exist. *Salvador v. United States,* 505 F.2d 1348, 1351–52 (8th Cir.1974). Under the *Dorman* test, a court determining whether there are exigent circumstances that would justify a warrantless search must consider: (1) the seriousness of the alleged offense;

(2) whether there is reasonable belief that the suspect is armed; (3) whether there is a clear showing of probable cause to believe that the suspect committed the alleged offense; (4) whether there is strong reason to believe that the suspect is on the premises; (5) the likelihood that the suspect will escape if not swiftly apprehended; and (6) whether entry may be made peaceably.[3] *Salvador,* 505 F.2d at 1351.

The Creightons first argue that the facts cited by the district court do not establish that a reasonable officer in Anderson's place could have believed his actions legal. The Creightons essentially concede that four [4] of the *Dorman* factors tend to establish exigent circumstances. They argue that considering two of the *Dorman* factors—whether there was strong reason to believe that the suspect was on the premises and whether the entry could be made peaceably—Anderson's conduct was not reasonable as a matter of law.

■ From the facts in the record, we conclude that Anderson could reasonably have believed there was strong reason to think Dixon would be at the Creighton home. First, he had information directly linking Vadaain and his wife, Cheryl, with the Creighton house. He had been told that Cheryl Dixon was living there, that Cheryl and Vadaain had been seeing each other daily during his detention at the Volunteers of America, and that Vadaain had spent time at the Creightons' during his pre-sentencing detention. Second, he had information linking Cheryl and Vadaain with the Creighton automobile, since he had been told Cheryl often picked up Va-

daain from the Volunteers of America in the Creighton car. Third, he had evidence of a tie between the Creighton automobile and the robbery. The description of the getaway car (maroon or burgundy over silver, possibly a Buick) corresponded closely enough with the description of the Creightons' car (red or burgundy Oldsmobile) to create a strong suspicion that they might be the same car. *Cf. Klingler v. United States,* 409 F.2d 299, 301–03 (8th Cir.), *cert. denied,* 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969) (probable cause where physical descriptions of suspect matched defendant and robbery vehicle was 1955 or 1956 white and brown Pontiac with Minnesota plates and helmets visible through rear window and defendant seen in 1957 white and salmon or coral Pontiac with South Dakota plates and helmets). This link was strengthened by his knowledge that Cheryl had sometimes had possession of the Creighton car and had participated in some of Vadaain's previous robberies. Fourth, two other likely places for Vadaain to have hidden and one of his past getaway drivers had been eliminated from the list of possibilities by the searches of Vadaain's mother's and grandmother's houses.

As for the likelihood that the entry could be made peaceably, it suffices to say that the entry was in fact made peacefully. The alleged violence did not occur until well after the entry and these allegations do not involve Anderson.

In sum, we believe the district court was correct as a matter of law in holding that the facts recited established that Anderson acted reasonably.[5]

---

**3.** The *Dorman* case also included as a factor whether the entry was made at night, but the court said this factor cut both ways, since it both made the entry more intrusive and made it more time consuming to get the warrant. 435 F.2d at 393.

Against the enumerated factors, the *Dorman* court weighed the delay involved in getting a warrant. *Id.* at 394. The Creightons argue that Anderson did not show there would have been an unacceptable delay involved in getting a warrant. In light of the facts that Vadaain was dangerous and likely to escape, and that Anderson had tried to contact the assistant U.S. attorneys and failed, we conclude that he acted

reasonably in deciding that further delay would bring unacceptable risks.

**4.** Those considerations are that the alleged offense was serious; there was reason to believe Vadaain Dixon was armed; there was a clear showing of probable cause that Dixon committed the offense; and the likelihood that Dixon would escape if not swiftly apprehended. *See* 724 F.Supp. at 658 n. 7.

**5.** We are aware of the recent case of *Minnesota v. Olson,* —— U.S. ——, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990), in which the Supreme Court affirmed a state court holding of no exigent circumstances when police entered without a

## II.

The Creightons' principal argument is that there is evidence in the record not cited by the district court that either creates a dispute over facts the district court relied on, or indeed, even calls for the conclusion that as a matter of law Anderson is not entitled to qualified immunity.

■ At the outset, we reject the Creightons' argument that *Creighton I*, 766 F.2d 1269 (8th Cir.1985), *vacated*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), establishes the existence of factual disputes as the law of the case. This argument overlooks the fact that the Supreme Court vacated *Creighton I* and remanded for further proceedings consistent with its opinion. *Anderson v. Creighton*, 483 U.S. at 646, 107 S.Ct. at 3042. A vacated opinion has no further force and effect. *Riha v. International Tel. & Tel.Corp.*, 533 F.2d 1053, 1054 (8th Cir.1976); *see County of Los Angeles v. Davis*, 440 U.S. 625, 634 n. 6, 99 S.Ct. 1379, n. 6, 59 L.Ed.2d 642 (1979) (no precedential effect). A vacated opinion is deprived of its standing, so that the law of the case doctrine is inapplicable. *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 177–78 (2d Cir.1967), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151 (1968).

Moreover, the discussion about unresolved factual issues in *Creighton I* was vitally affected by the Supreme Court's *Creighton* opinion, for the *Creighton I* panel held that there were factual disputes relating to whether Anderson had probable cause to believe Vadaain would be at the Creightons'. After the Supreme Court's

decision, the question to be resolved is not whether there was probable cause, but the distinct legal question of whether Anderson could reasonably have believed there was probable cause. *See Creighton*, 483 U.S. at 641, 107 S.Ct. at 3039; *Garionis*, 827 F.2d at 309 n. 5.

■ The Creightons bring up various evidence that they believe undermines the facts the district court relied on in holding there was strong reason to believe Vadaain would be at the Creightons. First, they argue that the only information possessed by Anderson that linked Cheryl to the Creighton house came from furlough cards that showed Vadaain as having been at the Creighton house three days in mid-October. While it is true Anderson had access to this information, nothing in the record suggests that this was Anderson's only source of information on the link between Cheryl and the Creighton home. On the contrary, Anderson testified in a deposition that he talked to Johnson, who told him he had learned from face-to-face interviews with Cheryl that she was living with the Creightons. App. B–144–5. Anderson's affidavit reiterates that his information came from talking to Cheryl and Vadaain Dixon and also states that Cheryl said she was staying with the Creightons because it was near the school she attended. App. A–87.

■ The Creightons argue that this information must be wholly discounted because Anderson knew Cheryl and Vadaain to be untrustworthy because they were robbers.[6] Assuming the facts known to

---

warrant into a house where they believed a robber was hiding. However, our holding is distinguishable from *Olson* because there was more reason to believe Dixon was dangerous, since he was believed to be armed, he was believed to have acted as the primary robber (rather than an accomplice), and the arrest occurred at night. The most important distinction, however, is that *Olson* was a criminal case, not a qualified immunity case, and therefore did not hold that the officers could not have reasonably believed that exigent circumstances existed. Moreover, of course, *Olson* was decided years after the events of this case, and therefore cannot be included as part of the law Anderson should have known.

A case closer to the facts of this case is *Llaguno v. Mingey*, 763 F.2d 1560 (7th Cir.1985) (en

banc), in which the court found sufficient evidence to uphold a finding of exigent circumstances when police made a warrantless entry of plaintiff's home in search of a killer who fled a car having plates registered to a member of plaintiff's household, a short distance from plaintiff's home, and the killer and the registered owner of the car both had Hispanic names.

**6.** The Creightons argue that the information Anderson received from Johnson was "hearsay." However, Johnson's statements were those of a fellow officer, which may be imputed to Anderson. *United States v. Rich*, 795 F.2d 680, 682 (8th Cir.1986). Vadaain's statements were not hearsay, since he himself was the suspect, and Anderson could reasonably have considered

Anderson show Vadaain and Cheryl to have been untrustworthy, we are not prepared to say that as a matter of law, police investigating crimes must not follow leads emanating from untrustworthy suspects. Moreover, in this case the similarity of the getaway car to the Creightons' car provided some corroboration of the information from Vadaain and Cheryl.

■ The Creightons also argue the furlough cards show that Vadaain was spending his day furloughs more regularly at his mother's home than at the Creighton's. While furlough cards from October 13 to November 8 only show Vadaain spent three days [7] at the Creightons', App. A–158–A–172, it is important to note that most of the rest of the cards do show that he spent his time at his mother's, where *Anderson searched first.* Having eliminated Iris Dixon's residence as a hideout, it was not unreasonable for Anderson to proceed to the Creightons' by process of elimination. Nor can we say that in the record as it exists there is conflicting evidence about what facts were in Anderson's possession on November 11.

■ The Creightons also argue that there is evidence that Anderson knew Cheryl was not living with the Creightons because he knew she had resided at her parents' house in the summer of 1983. While Anderson did state that he interviewed her while she was "staying at" her parents' in the summer of 1983, this was several months before the date of the November search. App. B–147–48. Therefore, we do not consider this to raise a disputed issue of fact.

■ The Creightons make three arguments that it was not reasonable to think that the Creighton car might be the getaway car. First, they argue that Anderson knew on November 11 that the Creighton car had blue and white Minnesota license plates and that the witness to the robbery getaway described the escape car as having a yellow plate. This fact is not sufficient

to create an issue as to whether Anderson reasonably could have believed the Creighton car might have been the one used in the robbery; common sense as well as record evidence tells us that a bank robber would be likely to use false plates on his getaway car. *See* Affidavit of M. Goergen, App. B–178 (usually in cases in which a witness sees a getaway car, the vehicle turns out to be either a stolen car, a car with stolen plates or a car bearing the plates of another vehicle). *See Klingler,* 409 F.2d at 303–04 (description of getaway car and defendant's car "substantially tallied," although plates were different). A reasonable officer could have believed there was a strong link between the robbery and the Creighton car, though the license plate described at the crime scene did not match the Creightons' proper license plate.

■ Second, the Creightons argue that the description of the getaway car (maroon or burgundy over silver, possibly a Buick) was so different from the description Jamie gave of the Creightons' car (maroon or burgundy Oldsmobile) that Anderson had no reason to believe they could be the same car. This discrepancy in the two descriptions available to Anderson was not so great as to render it unreasonable to follow up on this lead in the manner Anderson did. *See Klingler, id.*

■ Third, the Creightons point out that Anderson had reported seeing a black male (other than Vadaain) driving the getaway car and that therefore it was not reasonable to surmise that Cheryl and the Creightons' car could have been involved in the robbery. This does not follow, since Cheryl could have supplied the car without being in it during the actual robbery.

■ The Creightons make the point that Anderson knew that Vadaain Dixon was a fugitive on November 10 and should have begun the process of getting warrants on that day. Anderson's testimony indicates that "escape matters [were] handled by the U.S. Marshall's office," rather

---

reliable Cheryl's statements prior to the robbery about her own whereabouts.

7. The Creightons' brief states that the furlough cards show four days at the Creightons. Br. at 13.

than the FBI. App. B–117–18. More to the point, the situation obviously changed radically after Vadaain became the suspect in the Minnesota Federal robbery, which was after the photo line up, at about 8:00 p.m. on November 11, 1983.

### III.

 Finally, the Creightons argue that the district court erred in limiting discovery available on remand. The district court granted the Creightons' motion to depose Anderson about the search and the information he had that affected his course of action. His field notes were requested and made available. The district court denied motions to reopen the deposition and to compel Anderson to answer questions outside the limits of the qualified immunity issue and to depose others, including Johnson. The Supreme Court in *Anderson* limited discovery to the specific facts confronting Anderson. 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6. Generally, decisions regarding the scope of discovery are committed to the sound discretion of the district court. *Cook v. Kartridg Pak Co.*, 840 F.2d 602, 604 (8th Cir.1988). We see no abuse of discretion in the district court's implementation of the Supreme Court's mandate.

We affirm the judgment of the district court.